Bryan MANGRUM  *v.*  Ronald PIGUE, Sr.,
Ronald Pigue, Jr., Pig, Inc., Marshall Quinn d/b/a Marshall's
Flying Service and Ron Moss

03-853                                                    198 S.W.3d 496

Supreme Court of Arkansas
Opinion delivered November 11, 2004

*Henry Law Firm, PLC*, by: *Troy Henry*, for appellant.

*Butler, Hickey, Long & Harris*, by: *Fletcher Long, Jr.*, for appellees Marshall Flying Serv., Inc., and Ron Moss.

*Law Office of David W. Calhoon, PLC*, by: *David W. Calhoon*, for appellees, Ronald Pigue, Sr. and Pig, Inc.

BETTY C. DICKEY, Chief Justice. Bryan Mangrum alleges the damage to his corn crop was caused by appellees Ronald Pigue Sr., Ronald Pigue Jr., Marshal Flying Service, and Ron Moss. The trial judge granted appellees' motion for directed verdict, ruling as a matter of law, that the activity was not ultrahazardous, and ruling also that there was insufficient evidence to submit the issue of negligence to the jury. We affirm.

*Facts*

On February 14, 2001, Mangrum filed a complaint alleging Ron Moss, flying for Marshall's Flying Service, had negligently sprayed an ultrahazardous chemical, Roundup Ultra, onto the land of Ronald Pigue so that it drifted on to Mangrum's land, destroying his corn crop.

At trial, Ronald Pigue Sr., testified that he contracted with Marshall Flying Service to have his farm fields sprayed on May 10, 1997, with Roundup Ultra. Pigue also testified that he had applied for an Arkansas pesticide application and was re-certified in 1996. In the course of being re-certified, Pigue was required to attend a one-day course, at which he learned about the problem of chemicals drifting onto lands of another.

A few days after May 10, 1997, Mangrum noticed his corn wilting and turning brown. He called Mark Brawner, the County Extension agent for Greene County, who examined Mangrums's corn field and found discoloration of the leaves of the corn. Brawner recommended Mangrum contact the Arkansas State Plant Board ("Board") because of the possibility of a chemical drift. On May 19, 1997, the Board's Agricultural Specialist, Carlton Wann, investigated Mangrum's complaint of chemical drift, and determined the corn crop was stunted by a chemical consistent with Roundup Ultra.

William Johnson, an extension agronomist, also examined Mangrum's fields after the incident and noted that some areas of the field had stunted plants, primarily in the northeast corner. As Johnson moved westward the corn crops got larger, and he did not see as much stunting or yellowing of color, indicating a drift of Roundup Ultra. Johnson, in a letter to Mangrum, recommended that if Mangrum had not already applied Artizene, he should destroy his corn crop and plant soybeans.

Ford Lewis Baldwin, a weed scientist for the University of Arkansas Cooperative Extension Service, testified that since 1996, he had observed numerous instances of Roundup Ultra causing damage to corn crops from aerial drift. Baldwin commented that he had previously seen the drift for a mile and a half or more, and that it does not take very much Roundup on a crop to cause severe injury or death to a plant.

Joe Dan Lofton, with H & L Flying Service, testified that he hired Donald Masters to spray 2-4-D, Roundup, and Banvel on April 11, 1997. Marshall Quinn, owner of Marshall Flying Service, testified that Ronald Moss did spray Roundup Ultra on the Pigue farm on May 10, 1997, that the winds on that day were from the northeast, and that the Pigue farm was southwest of Mangrum's lot.

At the close of Mangrum's case-in-chief, appellees' counsel moved for a directed verdict stating that "there had been absolutely no proof that the damage to plaintiff's corn was in any way a result from the activities of the defendant." The trial court denied the directed verdict motion. At the conclusion of Ron Moss's testimony, appellees, again, moved for a directed verdict, which the trial court granted stating:

> It does appear that appellate courts have attached the ultra-hazardous label to 2-4-D because of its peculiar propensities. In fact, the cases refer specifically to 2-4-D, not to aerial dispensing of herbicides or pesticides in general. If it is going to be extended to cover other substances besides 2-4-D, the appellate courts have to do it, I am not going to do that.

> Since we are not dealing with 2-4-D, this is not an ultra-hazardous activity in and of itself and this is the only circumstances in which strict liability would apply.

> Therefore, we are left with negligence and if we are dealing with negligence, it is my understanding that the relationship would have

to be shown between the Piques and Marshall's Flying Service and Mr. Moss. I do not think that can be done. They were independent contractors. Therefore, the directed verdict is granted in favor of the Pigues.

With regard to negligence, the plaintiff had to show that defendants Marshall's Flying Service and Moss were negligent in this incident with Roundup and did some harm to the plaintiff and that defendants' acts were the proximate cause of harm the plaintiff suffered.

It would have to be shown that defendants did something that they should not have or failed to do something they should have. What plaintiff has shown is that he has suffered harm, he has shown no negligence whatsoever and there is no testimony so far that is concerned. Therefore, directed verdict in favor of the remaining defendants as well.

## Standard of Review

■ ■  In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Curry v. Thornsberry,* 354 Ark. 631, 128 S.W.3d 438 (2003); *Woodall v. Chuck Dory Auto Sales, Inc.,* 347 Ark. 260, 61 S.W.3d 835 (2001); *Lytle v. Wal-Mart Stores, Inc.,* 309 Ark. 139, 827 S.W.2d 652 (1992). A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Id.; Mankey v. Wal-Mart Stores, Inc.,* 314 Ark. 14, 858 S.W.2d 85 (1993). Stated another way, a motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Id.; Fayetteville Diagnostic Clinic v. Turner,* 344 Ark. 490, 42 S.W.3d 420 (2001); *Conagra, Inc. v. Strother,* 340 Ark. 672, 13 S.W.3d 150 (2000); *Wal-Mart Stores, Inc. v. Kelton,* 305 Ark. 173, 806 S.W.2d 373 (1991). Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.; Howard v. Hicks,* 304 Ark. 112, 800 S.W.2d 706 (1990).

## Ultrahazardous Activity

Mangrum argues that the aerial spraying of a poisonous herbicide in the vicinity of his corn crop was, as a matter of law, an

ultrahazardous activity and that the trial court erred in granting appellees' motion for directed verdict dismissing his complaint. We disagree and affirm the trial court.

██ This court has held that an activity is ultrahazardous if it necessarily involves a risk of serious harm to the person or chattels of others that cannot be eliminated by the exercise of the utmost care and is not a matter of common usage. *Zero Wholesale Gas Company v. Stroud,* 264 Ark. 27, 571 S.W.2d 74 (1978). In *Chapman Chemical Company,* this court applied the rule of absolute liability in cases involving damages caused by crop dusting with 2-4-D, and held:

> If one casts into the air a substance which he knows may do damage to others, and in some circumstances will certainly do so, principles of elementary justice, as well as the best public policy require that he know how far the substance will carry or be conveyed through the air and what damage it will do in the path of its journey, and if he releases such a substance either from ignorance of, or in indifference to the damage that may be done, the rule of strict liability should be applied.

215 Ark. at 643. There the court determined whether the case is a proper one for imposing absolute or strict liability is a question of law for the court.

██ AMI 1108, Ultrahazardous Activities, adopted *Chapman's* rationale and acknowledged that there was no issue for the jury on the questions of *Chapman's* absolute liability, this being a matter of law for the trial court to decide. AMI 1108 provides:

> By using _____ (explosives, poisons, etc. . . .), _____ (defendant) is liable for any [compensatory damages sustained by _____ (plaintiff) which were proximately caused by the use of the _____. You need only decide what those [compensatory] damages are and what amount _____ (plaintiff) should recover. _____ (plaintiff) has the burden of proving the amount of those damages cause by _____'s (defendant) use of the _____.

According to the Restatement of Torts, § 519:

> One who carries on an ultra hazardous activity is liable to another whose person, land, or chattels the actor should recognize as

likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto from that which makes the activity ultra hazardous, although the utmost care is exercised to prevent the harm.

Finally, Restatement of Torts § 523 provides:

> The rule stated in § 519 does not apply where the person harmed by the unpreventable miscarriage of an ultrahazardous activity has reason to know of the risk which makes the activity ultrahazardous and
>
> (a) takes part in it, or
>
> (b) brings himself within the area which will be endangered by its miscarriage
>
> (i) without a privilege, or
>
> (ii) in the exercise of a privilege derived from the consent of the person carrying on the activity, or
>
> (iii) as a member of the public entitled to the services of a public utility carrying on the activity.

Here, the trial court correctly held, as a matter of law, that the spraying of the widely used herbicide, Roundup Ultra, was not an ultrahazardous activity. There is simply an insufficient factual basis in this case to warrant such a drastic action on the part of this court. Roundup Ultra is a chemical that is commonly used in the farming community and is available for sale to the general public. According to the testimony of Ford Baldwin, the chemical can be controlled by the use of ordinary care as to the environmental factors which are present when it is applied. Since this court is not dealing with an ultrahazardous activity in and of itself, the aerial spraying of Roundup Ultra, strict liability does not apply and the trial court is affirmed.

### Negligence

Mangrum argues that the trial court erred in granting appellees' motion for directed verdict as there was sufficient evidence of negligence to be submitted to the jury. We disagree and affirm the trial court.

The burden of proof is always on the party asserting negligence, as negligence is never presumed. *Morehart v. Dillard Dep't Stores*, 322 Ark. 290, 908 S.W.2d 331 (1995). To establish a prima facie case of negligence, appellant must show that he sustained damages, that the defendants were negligent, and that such negligence was a proximate cause of his damages. *Id.* While a party may establish negligence by direct or circumstantial evidence, he cannot rely upon inferences based on conjecture or speculation. *Id.*

Negligence is the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do. *City of Caddo Valley v. George,* 340 Ark. 203, 9 S.W.3d 481 (2000). Proximate cause means a cause, which, in a natural and continuous sequence, produces damage and without which the damage would not have occurred. AMI 501.

Although unfortunate, the fact that Mangrum's corn crop was damaged is not in and of itself evidence of negligence. Ordinary care is the care a reasonably careful person would use under the circumstances similar to those shown by the evidence. AMI 303; *Wyles v. Webb,* 329 Ark. 108, 946 S.W.2d 685 (1997).

Mangrum argues that there have been several cases in Arkansas that have upheld jury verdicts for the aerial spraying of chemicals damaging crops when no finding of ultra-hazardous activity was made and the case was submitted to the jury on negligence of the landowner who was having his crop sprayed. *Burns v. Vaughn*, 216 Ark. 128, 129, 224 S.W.2d 365, 366 (1949); *Sullivan v. Voyles,* 249 Ark. 948, 462 S.W.2d 454 (1971); *W.B. Bynum Cooperage Co. v. Coulter,* 219 Ark. 818, 244 S.W.2d 955 (1952). However, these cases can be distinguished from the case at hand.

In *Burns v. Vaughn*, 216 Ark. 128, 129, 224 S.W.2d 365, 366 (1949), this court found that "it was settled by the *Taylor* case, *supra*, that one who uses a dust of this kind [2-4-D] is not liable to his neighbors in every case; negligence must be shown." In that case, "the appellant testified that he knew that the dust was dangerous and instructed his pilot not to release it if there was any wind. During the dusting operations a breeze arose, but the pilot continued to release the dust until appellant succeeded in stopping him." *Id.* This court held that this evidence was sufficient to make

the issue of negligence a matter for the jury. *Id.* However, there is no mention of any issue regarding proximate causation. It was accepted that the dust caused the damage and that the dust originated from appellee's farm.

This court, again, affirmed a jury verdict and rejected defendant's claim that there was no evidence of negligence in *Sullivan v. Voyles,* 249 Ark. 948, 462 S.W.2d 454 (1971). In that case, there was testimony that, when the spraying of defendant's land started, the wind was from the west northwest, blowing from the direction of defendant Sullivan's farm, where the spray was being applied and that the spray came over his farm. *Id.* As a result, his crops were damaged from the chemical that was sprayed. *Id.* In affirming the jury verdict and rejecting defendant Sullivan's claim that there was no evidence of negligence, this court held that the "testimony relative to the wind direction was substantial evidence of negligence in the application of the chemicals." *Id.* However, the complaining farmer was actually standing in his field and testified as to the wind direction and to the spray actually coming over onto his farm; therefore, there was direct evidence of negligence and proximate cause.

In *W.B. Bynum Cooperage Company v. Coulter* 219 Ark. 818, 244 S.W.2d 955 (1952), plaintiffs alleged damage to crops caused by W.B. Bynum Cooperage Co. through its negligent use of plane-sprayed 2-4-D. Bynum argued that the damage could have occurred from excessive rains, not the spraying of 2-4-D. *Id.* Bynum further testified that he was present when the crops were being sprayed and directions were given "to fly low, close control valves on the chemical tank before reaching the borderline of planting, and not to attain elevation for the purpose of turning while it was possible for any of the poison to escape." *Id.* at 819. There was also evidence that Bynum had a flagman placed near the end of his property to guard against overshooting, and the aviator was instructed to stop spraying when he reached the flag. *Id.* This court held that the same character of chemical used in spraying Bynum's crops had caused the injury to plaintiffs' crops in a nearby field, coupled with the admission of Bynum that a commercial aviator had been employed to apply the poison, were sufficient for a jury's inference that spray from the airplane's chemical supply drifted to plaintiffs' land. *W.B. Bynum, supra.* However, the evidence also revealed that the plane actually flew above the tree tops,

in wind blowing directly at the claimant's field. Further, there was a question about whether the plane was equipped with a system to cut off the spray.

In this case, there were no witnesses to the spraying of the Roundup Ultra other than Moss, who testified he took the proper precautions. Neither Mangrum, the Board representative, nor Mangrum's expert have opined that the damage originated from Moss's application of Roundup Ultra on the Pigue farm. Here, there is no testimony of malfunctioning equipment, piloting technique, or any specific identification that the Roundup Ultra, in fact, drifted outside its intended target.

According to Carlton Wann, part of his job with the Board is to investigate complaints of "chemicals, target-off drift." Wann obtained copies of the invoices dated May 10, 1997, showing that Pigue purchased the Roundup Ultra and Prowl, chemicals Marshall Flying Service applied by air that same day at Pigue's request. According to Wann, Roundup Ultra is not a restricted chemical and farmers need keep no record of its use. With respect to actions by Marshall Flying Service, Wann testified:

> I looked at the application made by Ron Moss on May 10th for Marshall's Flying Service. *I don't recall finding anything in their records that violated any State Plant Board regulations. Insofar as I could tell, everything that Ron Moss did on that occasion was in compliance with applicable State Plant Board regulations.*

(Emphasis added). Wann also testified, "I did not find anything amiss, remiss or missing in any shape or form or fashion in the records of Marshall's Flying Service."

Ford Lewis Baldwin, recently retired from the University of Arkansas Extension Service, testified about aerial application of chemicals generally, but offered no testimony whatever regarding proper or improper conduct by the defendants. No witness testified that the defendants were negligent in the application of Roundup and Prowl on May 10, 1997. To the contrary, Ron Moss, the pilot from Marshall Flying Service, testified that he checked wind and conditions for applying the herbicides, found the wind to be three miles per hour, proceeded to the fields he was to treat, and checked to see if anything was growing within a quarter-mile of the fields that might be harmed. He then confirmed wind and direction conditions by blowing smoke from his

plane as he flew over the field. Only then did Moss apply the herbicides. Moss also testified that on the Pigue fields he used the largest orifice to reduce fine particles produced by aerial application, and that because Prowl was being applied, the spray had a yellow color that was visible. Ross further testified he saw no drift. There was no evidence of breach of the defendants' duty of care.

Furthermore, the trial court was correct in ruling that Mangrum failed to show proximate causation. The trial court found that Mangrum had shown he suffered harm, but failed to show negligence. Again, no witnesses were produced who observed any drift take place, nor was there any evidence of faulty equipment, erratic flying, or other malfeasance on the part of appellees. Juries are not permitted to guess or to speculate as to the proximate cause of an alleged injury. *Turner v. Hot Springs St. Rw. Co.,* 189 Ark. 894, 75 S.W.2d 675 (1934). The burden rests upon the appellant to show by a preponderance of evidence that his injuries were caused by some negligent act or omission of appellees. *Id.* To submit to a jury a choice of possibilities is but to permit the jury to conjecture or guess, and where the evidence presents no more than such choice, it is not substantial. *Henry H. Cross Co. v. Simmons,* 96 F.2d 483 (8th Cir. 1938). Conjecture and speculation, however plausible, cannot be permitted to supply the place of proof. *Glidewell v. Arkhola Sand & Gravel Co.,* 212 Ark. 838, 208 S.W.2d 4 (1948).

The evidence in this case was that this aerial application was made under optimal conditions for safety. Moss did everything he was supposed to do. The evidence in this case showed that Roundup was commonly used under the existing conditions. Mere use is not evidence of negligence. The evidence also showed that the three mile per hour wind and time of day when the spraying was done constituted optimal conditions to prevent harm. There was evidence that application in a dead calm could create a greater risk of drift than application in a slight wind. There was no evidence of a breach of the standard of care. The element of breach of a duty of care is not met. Even if there were evidence of breach of that duty, and there was not, there is no evidence that the damage to Mangrum's corn was proximately caused by the defendants.

Negligence is not imposed in the absence of proof. *Bess v. Herrin,* 309 Ark. 555, 831 S.W.2d 907 (1992). The

fact that an accident occurred with nothing more is not evidence of negligence on the part of anyone. *Nichols v. Int'l Paper Co.*, 278 Ark. 226, 644 S.W.2d 583 (1983). Clearly, Mangrum's corn was damaged by accident. Negligence is not presumed from the mere happening of an accident. *Id.* Further, except in cases where *res ipsa loquitur* applies, negligence must be proven. *Id. Res ipsa loquitur* is inapplicable in this case. The doctrine was developed to assist in the proof of negligence where the cause is connected with an instrumentality in the exclusive control of a defendant. *Barker v. Clark*, 343 Ark. 8, 33 S.W.3d 476 (2000) (quoting *Reece v. Webster*, 221 Ark. 826, 256 S.W.2d 345 (1953)). It applies where the evidence of the true cause is available to the defendant but not to the plaintiff. *Dollins v. Hartford Accident & Indem. Co.*, 252 Ark. 13, 477 S.W.2d 179 (1972). In the case before us, Wann testified that Mangrum's cornfield showed symptoms of not just Roundup, but also of 2-4-D. We have no idea where the 2-4-D came from, and the Roundup may or may not have come from Pigue. The circuit court correctly stated:

> It would have to be shown that defendants did something that they should not have or failed to do something they should have. What plaintiff has shown is that he has suffered harm; he has shown no negligence whatsoever and there is no testimony so far as that is concerned.

Affirmed.